**Samuel L. Day, George Wright, Solomon Mercer and James Mercer v. Fort Scott Investment and Improvement Company.**

1. ALTERATION OF WRITTEN INSTRUMENTS—*When Material and When Not.*—Where it is manifest there was no fraudulent purpose, and no harm has been done by the alteration of an instrument, and it is within the power of a court of equity to correct it so as to make it agree with the original intentions of the parties, the alteration is not material.

2. CONTRACTS FOR SPECIFIC PERFORMANCE—*Power of Courts of Equity to Correct.*—In an action for specific performance of a contract for the sale of land it is within the power of a court of equity to correct the contract so as to make it agree with the intentions of the parties in matters of description for the purpose of identifying the property involved.

3. FRAUD—*An Unexecuted Intention.*—As distinguished from a false representation of a fact a false representation of a matter of intention not amounting to a matter of fact, though it may have influenced a transaction, is not a fraud in law.

4. FRAUDULENT REPRESENTATIONS—*Must Refer to Present or Past State of Things.*—Fraudulent representations must in all ordinary cases

have reference to a present or past state of things, for if a party make a representation concerning something in the future, it must generally be a statement of intention or opinion uncertain to the knowledge of both parties.

5.   FRAUDULENT REPRESENTATIONS—*Statement of Intention.*—A statement of intention merely can not be a misrepresentation amounting to fraud since such a statement is not the affirmation of an external fact, but is at most only an assertion that a present mental condition or opinion exists.

6.   RESCISSION OF CONTRACTS—*Requisites of the Act.*—When a party desires to rescind upon the ground of mistake or fraud he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he is silent and continues to treat the property as his own, he will be held to have waived the objection and will be conclusively bound by the contract as if the mistake or fraud had not occurred.   He is not permitted to play fast and loose.   Delay and vacillation are fatal to the rights which had before existed.

7.   SPECIFIC PERFORMANCE—*Power of a Court of Equity to Decree.*— Where the elements, conditions and incidents are such as equity deems essential, it is as much a matter of course for a court of equity to decree specific performance of a contract, as it is for a court of law to award damages for its breach.

**Memorandum.**—Bill for specific performance.   Error to the Circuit Court of Ford County; the Hon. ALFRED SAMPLE, Judge, presiding. Heard in this court at the November term, 1893, and affirmed.   Opinion filed February 12, 1894.

The opinion states the case.

BRIEF OF PLAINTIFFS IN ERROR, COOK & MOFFETT, ATTORNEYS.

An application for specific performance of a contract is addressed to the sound legal discretion of the court, and even where a legal contract is shown to exist it will not be decreed as a matter of course.   Bowman v. Cunningham, 78 Ill. 48; Frisby v. Ballance, 4 Scam. 287; DeWolf v. Pratt, 42 Ill. 198.

It is not a matter of right, but a matter of sound discretion in the court, which may grant or deny relief, as may appear equitable under all the facts and circumstances of the case. Woods v. Evans, 113 Ill. 186; Shaw v. Schoonover, 130 Ill. 448.

Where there is anything by reason of a change of circumstances in regard to the property that makes it unconscion-

able that complainant should have specific performance, it will not be decreed. Iglehart v. Vail, 73 Ill. 63.

It is only on the principle that it is unjust and inequitable to permit the contract to remain unexecuted that a court of chancery assumes the power to enforce it. Tamm v. Lavalle, 92 Ill. 263.

Complainant must have clean hands and a cause that appeals to equity for relief. Kelly v. Kendall et al., 118 Ill. 650 (654).

Misrepresentations or any unfairness are among the causes which will induce the court to refuse its aid. Cathcart v. Robinson, 5 Pet. 264.

It is not necessary to authorize the court to refuse a specific performance that the agreement should be so tainted with fraud as to authorize a decree that it should be given up and canceled on that account. Frisby v. Ballance, 4 Scam. 287.

It is not necessary to establish fraud, imposition or mistake with same certainty in order to defeat specific performance, as to have contract set aside. Race v. Weston, 86 Ill. 92.

BRIEF OF DEFENDANT IN ERROR, J. H. MOFFETT, ATTORNEY; J. D. McCLEVERTY, OF COUNSEL.

A statement or representation as to something to be done and performed in the future can not be made ground for a defensive or offensive right at equity or law. Bradfield v. Elyton Land Co. (Ala.) 8 So. Rep. 383; Montgomery R. R. Co. v. Mathers, 77 Ala. 357; Lake v. Security Loan Asso., 72 Ala. 207; Chicago T. & M. C. Ry. Co. v. Tetterington, 31 Am. St. Rep. 39; 84 Tex. 218; Tuck v. Downing, 76 Ill. 71; Gage v. Lewis, 68 Ill. 604; Dillman v. Nadelhoffer, 119 Ill. 567; Young v. Young, 113 Ill. 430; Bristol v. Braidwood, 28 Mich. 191; Lawrence v. Gayetty, 78 Cal. 126; 12 Am. St. Rep. 29; Knowlton v. Keenan, 146 Mass. 86.

The fact that property depreciates in value rapidly and should only be worth one-third or one-fourth of the cost or original price, does not render the contract unconscionable

in the meaning of that term, when considered by courts of equity. Franklin Tel. Co. v. Harrison, 145 U. S. 559; 12 Supreme Court Rep. 900; Cathcart v. Robinson, 5 Pet. 264–271; Marble Co. v. Ripley, 10 Wall. 339.

The law is well settled both at law and equity, that when the party discovers that fraud has been practiced upon him it is his duty at once, without any delay, to repudiate the contract which was induced by such fraud and tender back what he received, so as to, as nearly as possible, place the party in *statu quo*. Grymes v. Sanders, 93 U. S. (3 Otto) 55; Greenwood v. Fenn, 136 Ill. 146; Pomeroy's Eq. Jur., Secs. 897, 964, 965; Livingston v. Strong, 107 Ill. 295; Crooks v. Nippolt, 46 N. W. Rep. 349; Strong v. Lord, 107 Ill. 25; Dowden v. Wilson, 108 Ill. 257; Kelsey v. Snyder, 118 Ill. 544.

The alteration in the contract was not fraudulent and therefore does not affect the contract. Lead Co. v. Madden, 54 Ill. 260; Burlingame v. Brewster, 79 Ill. 515; Condic v. Flower, 106 Ill. 105.

It can not be considered an alteration. It was the act of a stranger and is termed a spoliation. Medlin v. Platte Co., 40 Am. Dec. 135–139; Piersoll v. Grimes, 95 Am. Dec. 673; Hunt v. Gray, 10 Am. Rep. 232; Bridges v. Winters, 97 Am. Dec. 443; Vogle v. Ripper, 34 Ill. 100; Lee v. Alexander, 48 Am. Dec. 412; 1 Greenleaf on Evidence, Sec. 566; First National Bank v. Ryan, 31 Ill. App. 271.


MR. JUSTICE WALL DELIVERED THE OPINION OF THE COURT.

The Fort Scott Investment and Improvement Company, a corporation existing under the laws of the State of Kansas, filed a bill in chancery in the Circuit Court of Ford County against Samuel L. Day, George Wright, Solomon Mercer and James Mercer, alleging that on the 28th of April, 1887, the complainant and the defendants entered into a written agreement by which the complainant, in consideration of $6,300, paid and to be paid, agreed to sell to defendants and they agreed to buy, certain described lots, thirty-six in number, in the South Side Park addition to Fort Scott, Kansas;

that one-third of the purchase money was paid at the time, and the balance, in equal sums, was to be paid in one and two years, with eight per cent interest, deed to be given when purchasers desired, for any one or more of the lots; that on the 16th of July, 1888, the defendants sold to Thomas Swan, four of said lots, and he paid complainant $540, the balance due on said four lots, and complainant made said Swan a deed for the same; that defendants neglected to make the deferred payments on the remaining thirty-two lots, according to contract, and that said payments being past due, the complainant, on, etc., tendered them a deed for said remaining lots, and made formal demand for the balance due; that the defendants refused to make said payment and accept the said deed; that the deed is still in readiness, etc., and prayed that defendants be compelled to specifically perform the agreement on their part and pay the balance so due the complainant.

By their answer the defendants set up as a defense that they were induced to enter into the agreement by the false and fraudulent promise of the complainant that it would extend a certain street railway which it was then operating in said city, to and through said addition in which said lots were located; that rails and ties had been placed on the ground along the line of the proposed extension; and by the further promise that complainant would continue to bore for natural gas, boring having been begun, and that in a short time it would have said natural gas, and would have said extended street railway in operation, and that soon after defendants were so induced to enter into said contract, the complainant took away said ties and rails so distributed and took up the railway already built, and abandoned the boring for gas; that by reason of the failure of said complainant to do as it had so promised the lots became worthless, and that if the said representations had been fulfilled the defendants could have realized a profit on said purchase. The defendants also filed a cross-bill setting up the facts contained in the answer, and prayed that the contract be declared void and that the amount paid be refunded.

The complainant in answer to the cross-bill denied that the defendants were induced by false promises and representations to make said contract; alleged that they bought on their own judgment; that the street railway was and is a permanent structure, and that the said ties and rails so distributed for the proposed extension were not placed there for the alleged fraudulent purpose; that the boring for natural gas was continued until it was proved that gas in paying quantity could not be found, and denied all false representations alleged, etc.

An amended cross-bill was filed in which it was averred that the contract as it was signed did not describe the prop-. erty as alleged in complainant's bill, in that it did not contain the words, " in the South Side Park addition to Fort Scott," merely describing the property as being in Bourbon county, Kansas, and giving the numbers of the lots and blocks, averring that the said omission had not been discovered until since the filing of the answer and the original cross-bill; that the original contract had not been signed by and in the name of the complainant but merely by S. F. Scott & Co., its agents; and that this fact had not been discovered by defendants until since they had filed their answer and original cross-bill; that the said contract had been changed since it was signed by the addition of the matters stated, and that by reason of the said alterations the contract had become void; also repeating in substance the allegations of the original cross-bill as to false representations, and adding that the complainant had also fraudulently and falsely represented that it owned a spring of pure, fresh water in or adjacent to said addition, which it would clean out and deepen; and that it would beautify the grounds thereabout by planting trees, etc.; and that this representation which was never fulfilled had a material influence upon the defendants in leading them to enter into said agreement of purchase.

The complainant answered the amended cross-bill, admitting that the contract set out in the original bill was not, when signed, in the words and figures therein stated, and

that since the signing of the same the words "in South Side Park addition to Fort Scott" had been inserted in the copy of the contract held by the complainant, but averred the said alteration was made without its knowledge, approval or consent, and without any fraudulent or improper purpose; and that the insertion of said words merely made the contract read as it was by the parties intended; and that the defendants, by divers letters, orders and other papers by them written and signed as well as by their answer and original cross-bill had so repeatedly recognized and admitted.

Leave was given complainant to amend the original bill by averring the omission of said words, descriptive of the South Side Park addition, etc., and praying that the contract might be corrected in that particular, and enforced as prayed originally.

The cause was referred to a special master to take and report proofs and conclusions.

The report was filed and sundry exceptions were taken thereto before the master, which exceptions he overruled. The same exceptions were presented to the court, and upon consideration of the whole matter the court sustained the master and entered a decree according to prayer of the original bill as amended and required defendants to pay the complainant $5,398.30, being the balance due under the contract for the lots not paid for, dismissing the cross-bills and taxing the defendants with all costs.

By a writ of error the defendants below have brought the record to this court and they now present various objections to the decree.

There seems to be no force in the point that the contract had been altered, and that in its original condition it did not describe the property alleged in the bill or any other property with sufficient accuracy.

It appears that the contract was made in duplicate, each party having a copy. When that held by the vendor was placed in the hands of an attorney to be enforced by legal proceedings he noticed the omission of the descriptive words

as to the addition in which the lots were located, and also the omission of the corporate name of the vendor in the signature, and assuming without much reflection that this was a mere copy, and that the omissions referred to did not occur in the original, he made the additions without suggestion or authority from his client.

It was manifest there was no fraudulent purpose here, and that no harm was done.

The identity of the instrument was not destroyed. The copy held by the vendee was not in any wise affected. It does not appear that an amendment of the contract by inserting these descriptive words was at all necessary, since for all that appears, there may be no other lots and blocks corresponding to the numbers here given in Bourbon county, Kansas, and so the addition of the words, " in the South Side Park addition," etc., may be wholly unnecessary for the purpose of identifying the property involved.

If, however, these descriptive words are essential, yet it was clearly within the power of a court of equity to correct the contract so as to make it agree with the intention of the parties, and there is no lack of proof in the record that the property as to which the parties dealt was in said South Side Park addition.   The decree does not in so many words order and adjudge that the contract be so corrected, but it finds that the complainant is entitled to a decree of specific performance as prayed for in the original bill as amended with respect to the lots, which are there fully set out and described.   Such a decree, when considered in connection with the pleadings and the proofs, is substantially sufficient in this respect, though it would have been more formal to say in terms that the contract was amended and corrected in regard to the description and as prayed in the amendment to the bill.

The important and vital question in the case is, whether, on the proofs, the complainant was entitled to a specific performance of the contract set out in the original bill.

The defense was predicated upon the alleged fraudulent methods adopted by the complainant for the purpose of inducing the defendants to make the contract.

The matters so complained of were, the alleged misrepresentations as to the intention of the complainant in prospecting for natural gas, in developing the spring and beautifying the vicinity, and in regard to the extension of the street railway.

It will be noticed that the representations charged to have been false and fraudulent referred to no existing facts, but merely amounted to promises as to something to be done in the future. As was said in Gage v. Lewis, 68 Ill. 604: "Even if, at the time they were made, it was not intended to comply with them, it was but an unexecuted intention which has never been held of itself to constitute fraud." "As distinguished from the false representation of a fact, the false representation of a matter of intention, not amounting to a matter of fact, though it may have influenced a transaction, is not a fraud in law." Kerr on Fraud and Mistake, 88.

So it is said in Bigelow on Estoppel, 481: "The representations or concealment must, also, in all ordinary cases, have reference to a present or past state of things; for if a party make a representation concerning something in the future, it must generally be a statement of intention or opinion, uncertain to the knowledge of both parties, or it will come to a contract with the peculiar consequences of a contract." In Pomeroy's Eq. Jur., Sec. 877, it is said: "A statement of intention merely, can not be a misrepresentation amounting to fraud, since such a statement is not the affirmation of an external fact, but is, at most, only an assertion that a present mental condition or opinion exists."

Such is, no doubt, the general rule.

As to the development of natural gas and the improvement of the spring and the property adjacent, it seems quite clear there is no sufficient ground for denying the relief sought by the bill. It appears from the evidence that the boring for natural gas was prosecuted by other parties until it was demonstrated that there was no such quantity to be had as to be of practical value.

Natural gas had been found in shallow wells and in small quantities, and it was thought that deeper wells would develop an abundant supply, but it turned out otherwise, and this, no doubt, had much to do with breaking the "boom" in this and adjacent property.

The failure by the complainant to further prosecute its boring, should not be deemed important in view of the result established by other borings.

The deepening of the spring and making attractive surroundings was very clearly a matter which would rest wholly in the future, and about which there could be merely an intention dependent upon the contingency that circumstances would justify such action. It can hardly be supposed that a practical man would attach any importance to a matter manifestly so contingent and indefinite.

There is more difficulty as to the alleged representations with regard to the street railway. It appears that the complainant was the owner of said railway, and that at the time this contract was made, the line was in operation a considerable distance toward this addition, and ties and rails had been distributed upon a part of the line of a proposed extension which would pass through the addition, and it was proved that Brown, the agent of the complainant, showed the defendants where the extension would run, and assured them that it would be built as proposed. It is shown also that the lots, or some of them, were selected with reference to the proposed line, and it may be assumed that the belief of the defendants that the line would be so extended had much to do, not only with their selection of lots, but also with their determination to invest in the addition. It is, however, not probable that they would have so invested, but for their faith in the future of the city. If that faith was well founded, the growth in that direction would certainly justify the extension of the railway as projected and proposed. So they probably reasoned, and hence they believed the railway would be extended because they believed the city would grow in that direction, independently of any assurances they received from the complainant's agent.

But the failure of natural gas, and other causes, had a depressing effect. The prospect changed. According to the testimony, the "boom" in this addition and perhaps in the city, began to subside soon after the contract was made.

The ties and rails that had been so distributed along the proposed extension were removed during the summer; the line was not extended, and a part of that already laid was taken up and diverted so as to reach the fair ground lying in a somewhat different direction.

Only a part of the line as now laid is operated daily, the residue extending to the fair ground only when the fair or other attractions make it desirable.

All this followed as the natural result of the general depression in the locality.

Had the expected growth been realized, the street railway would have been required, and very probably it would have been extended as was planned. But, upon a moment's reflection it would have occurred to the defendants, who were men of some experience, and in the habit of acting upon their own judgment, that the railway would be extended in the contingency that it was needed, and not otherwise, and they must have understood it was in view of this contingency, then on all hands believed to be almost a certainty, that the alleged representations or promises were made. Thus it is seen that such representations were not of a fact then existing, but purely of an intention or purpose with reference to the future, which might be wholly changed by subsequent developments.

It was not a part of the contract that this should be done, for it was not inserted, nor intended to be inserted in the contract, either as a condition or as a consideration.

Nor does it appear that there was any false purpose on the part of complainant.

It is only a matter of inference whether the representations were in good or bad faith.

There is nothing to show the latter, while the presumption of the former is supported by the fact that self-interest would have promoted the extension, if the situation had de-

manded it. But of what use would the railway be to either the complainant or the defendants, if there were no people resident in that addition to patronize and maintain it? How could anybody expect it would be built under such circumstances?

Soon after the purchase was made the defendants divided thirty-two of the lots among themselves. The defendant Day remained at Fort Scott until near the close of the year 1887, for the purpose of handling and disposing of the property, the others returning to Illinois.

He had a desk in the room of Scott & Co., who were the agents of complainant.

He was familiar with the transactions of the complainant, and knew what was being done or omitted with reference to property in this addition, boring for gas and the operation of the street railway. He returned to Ford county, Illinois, where he and the other defendants resided, about the beginning of the year 1888, and he says that they determined, before April, 1888, when the first deferred payment was due, that they would pay no more on the contract if they could avoid it, because of the " misrepresentations as to the proposed street railway and proposed gas well."

They made no objection to the complainant.

On the 4th of May, the complainant, by letter, requested the defendants to attend to the matter of the first deferred payment, then overdue, to which Day replied that he still held a small interest in the lots and had frequently spoken to the other parties about the payments due April 28th; that the contract was joint and that it appeared to be difficult to get all ready at once; that he would see what could be done. On the 17th of May the complainant again wrote defendants with regard to the matter and said that if payment was not made by June 1st, suit would be commenced. No response to this appears in the record.

While Day was at Fort Scott he sold half of his interest in the lots to one Rawlings, who traded the same to said Swan.

The latter wished to pay the balance due and obtain a

deed for his lots, and the defendants wrote the complainant as follows:

PAXTON, ILL., July 4, 1888.

FORT SCOTT INVESTMENT CO.:

In compliance with our contract with you for the S. S. Park lots, please make deed to Mr. Swan, to the following described lots: Lot 2, block 48, lot 5, block 48, lot 1, block 46, lot 12, block 85, all in South Side Park addition to Fort Scott, Kansas. By doing so you will oblige,

S. L. DAY,
JAMES MERCER,
SOLOMON MERCER,
GEORGE WRIGHT.

This request was complied with and the lots named were deeded to Swan.

On the 5th of July, 1888, Day wrote as follows:

PAXTON, ILL., July 5, 1888.

FORT SCOTT INVESTMENT CO.:

We have just given Mr. Swan an order on you for a deed to four lots described in order. He says he has arrangements with you to send deed to bank here where he has money to pay in full for the lots. You must not be too hard on us for balance due. We need all the leniency you can possibly give and give us a chance to dispose of the others in some way. We have several trades on hand and hope to dispose of some of them. Give us a chance to get out of the hole. We have paid you a good deal of money and spent a good deal of time, money, and gas on Fort Scott. Don't care anything about the time and gas, but would like the money back and think if it was convenient to hold the lots a few years, there is money in them. I have more confidence in Fort Scott than in any city in Kansas, and hear more of Fort Scott and Hutchinson than all the balance in the State.                S. L. DAY.

Thus it appears that while the defendants well knew that the railway extension was not made, and that gas, in paying quantities, had not been developed, and while for these reasons they had determined not to make the payment due in

April, 1888, yet after that time, when requested to pay, they made no claim for a rescission of the contract, but in the most positive and definite way affirmed it by asking for a deed to be made to a portion of the property in pursuance of the contract, and it was done accordingly.

They knew that there was then no purpose to extend the railway, for the ties and rails that were lying along the proposed extension were taken away as early as September, 1887. Day knew this from personal observation and so did James Mercer, who was there after it was done. The other defendants, no doubt, were informed of it. They also knew the effort to find gas had ceased. If in this they had been defrauded they knew it, and yet they took no steps to avoid or rescind the contract; on the other hand, what they did was distinctly in affirmance of it; and not only so, but their action was such as to make it impossible for them to place the complainant *in statu quo.*

How do these facts affect the rights of the parties ? In Greenwood v. Finn, 136 Ill. 146, which was a bill to rescind a contract for the sale of land upon the ground of alleged fraudulent representations of facts as to the quality of the land, it was said :

" The rule on this subject is well stated in Grymes v. Sanders, 93 U. S. 55, is as follows :

' When a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent and continue to treat the property as his own he will be held to have waived the objection and will be conclusively bound by the contract as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the rights which had before subsisted.'

The rule is also laid down in 2 Pomeroy's Eq. Jur., Sec. 897, as follows :

' All these considerations as to the nature of misrepresentations require great punctuality and promptness of action by the deceived party upon his discovery of the fraud.

Day v. Ft. Scott Investment & Improvement Co.

' The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract or abandon the transaction and give the other party an opportunity of rescinding it and of restoring both of them to the original position.

' He is not allowed to go on and derive all possible benefits from the transaction and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefits of and relief from the misrepresentations.' "

Applying the rule thus stated to the case in hand, it is quite clear that even if the misrepresentations in question were as to existing facts, and not mere matters of intention with regard to things to be done in the future, the defendants have so acted that they can not ask a court of equity to rescind the contract, and hence the relief sought by the cross-bill in this respect was properly denied.

It is contended, however, that the decree for specific performance will not follow upon a state of facts where a rescission would be denied, and that where there was misrepresentation, whether fraudulent and intentional or not, inducing, reasonably, the making of the contract, and where it would be grossly inequitable and unconscionable under all the circumstances to specifically enforce the contract, it will not be done.

It is also argued that the granting of such a decree is not a matter of course, but is discretionary. As is said by Pomeroy in his work on Equity Jurisprudence, the use of this term may be misleading and inaccurate, for the rule is that where the elements, conditions and incidents are such as equity deems essential, it is as much a matter of course for a court of equity to decree specific performance of a contract as it is for a court of law to award damages for its breach. It is unnecessary to state all of those conditions, incidents and elements, but if there was misrepresentation, whether fraud-

ulent and intentional or not, of such sort, upon which reli- ·
ance was reasonably had, this will suffice to bar the remedy.
Still, equity maintains the distinction between statements of
fact which form a part of the transaction, and representa-
tions which are mere expressions of hope, opinion or expec-
tation, and the distinction is applicable here.   "When the
representation consists of general commendations or mere
expressions of hope, expectation or opinion, and the like, and
where it relates to matters which from their nature, situa-
tion or time can not be supposed to be within the knowledge,
or under the power of the party making the statement, the
party to whom it is made is not justified in relying upon it
and assuming it to be true; he is bound to make inquiry and
examination for himself so as to ascertain the truth, and in
the absence of evidence it will be presumed he has done so
and acted upon the result of his own inquiry and examina-
tion." Pomeroy's Eq., Jur., Sec. 891.

The principle of the rule thus laid down would apply to
the case at bar, where it was plain that the talk of street
railway extension was necessarily contingent and dependent
upon conditions then anticipated by both parties, but beyond
the control of either party.

These conditions were implied, and had it been supposed
they would fail, no reasonable man would have expected
the extension to be built, no matter how vigorously it might
have been promised.

Such representations or assurances with reference to such
a transaction, are in substance and effect but little different
from mere commendations, for they are based wholly upon
the idea of a favored and exceptional situation, which will
presumably induce a great influx of capital and population.

Expectations no more extravagant have often been real-
ized, and it is not to be said there was no foundation for the
views entertained by both parties in this instance.   ·

As already noticed, the defendants were from time to time
aware of the progress of events.   They knew that the gas
was not developed by the complainant, and that it was not
worth while to undertake to do so in the light of the results
of deep wells which were sunk by other parties, and they

knew the railway extension project had been abandoned and yet they recognized and approved the contract and requested a conveyance of four of the lots to Swan.

After this was done, the contract could be rescinded and parties placed *in statu quo* in part only, not in full, and as was said in Grymes v. Sanders, *supra*, under such circumstances, the defendants "will be held to have waived the objection and will be conclusively bound by the contract, as if the mistake or fraud had not occurred."

Nor is there anything unconscionable in a legal or equitable sense in the enforcement of this contract. That the property will not now sell for what it was sold for to the defendants is not of controlling importance. It appears from the evidence that Day might have sold it at an advance, but he held on too long.

The value mutually agreed upon was, of course, speculative. The expectation of both parties has not been realized. If it had, there would be no occasion to appeal to the law. Heavy profits would have accrued from the advance, and no one would have questioned the right of defendants to enjoy their legitimate gains.

The price agreed to be paid, $175 per lot, was not extravagant if the property was worth anything in the shape of lots, and whether it would be worth anything in that shape was purely a matter of opinion and belief.

The judgment then formed by both vendor and vendees may yet be realized, and the growth of the city, though delayed, may, in the end, justify all that has been expected of it. At least, a court of equity can not assume it will not so turn out, and upon that assumption regard the bargain as unfair and unconscionable and therefore refuse the relief prayed.

Upon the whole, we are of opinion that the decree of the Circuit Court accords with the principles of equity and that it should be affirmed.